Jessica E. Sutton, Esq.
Bar Number: 038994
PHILLIPS BLACK, INC.
1721 Broadway, Ste. 201
Oakland, CA 94612
(888) 532-0897
j.sutton@phillipsblack.org

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Pete Van Winkle,<br>Plaintiff,<br>vs.<br><br>Robert Winfrey, Ryan Thornell, and Arizona Department of Corrections, Rehabilitation, and Reentry.,<br>Defendants, | District Case No.<br><br><br>**COMPLAINT** |

**CIVIL COMPLAINT AND REQUEST FOR INJUNCTIVE AND DECLARATORY RELIEF UNDER 42 U.S.C. § 1983**

Plaintiff Pete Van Winkle, by and through counsel, brings the following complaint challenging his conditions of confinement.

## INTRODUCTION

1. Pete Van Winkle is a 44-year-old reformed and renounced gang member

who has been incarcerated at the Arizona Department of Corrections, Rehabilitation, and Reentry under a sentence of death for the last sixteen years – the past two of which he has served in a filthy, windowless, 8x10 cell in solitary confinement. Despite renouncing his gang affiliation and successfully debriefing with the ADCRR in 2025 – a courageous act that placed him at great risk – and remaining violation-free since January 2025, Mr. Van Winkle has suffered cruel conditions of confinement with no possibility of moving to a less restrictive setting. *See* Exhibit A at 10, Declaration of David Pyrooz ("debriefing requirements to reclassify can expose people to serious risk").

2. As detailed in the *Jensen v. Thornell*, (No. CV-12-00601-PHX-ROS, D. Ariz. Doc. 4335), the cell where Mr. Van Winkle is housed measures less than 8x12 feet and does not have windows. *See* Exhibit B at 144-148, *Jensen v. Thornell*, Findings of Fact- Post-Trial. Inside the cells are "a bare concrete box with a metal stool, shelf, toilet/sink and either a single or double slab for a bed." Mr. Van Winkle has little exposure to sunlight, as "[t]he doors to the cells have no windows but are made of perforated steel." Exhibit B at 144, citing Doc. 4122 at 61 (Proposed Declaration of

Dr. Craig Haney, Ph.D, J.D.). Thus, the only natural light in the units comes from "gritty skylights in the ceiling outside the cells." *Id.* at 60. These units were "designed to be maximally controlling" and are "maximally depriving" in practice. Exhibit B at 144. The expert in *Jensen* characterized them as "very severe, dehumanizing units." Exhibit B at 144, citing Doc. 4306 at 42, (Amended Transcript, closed access).

3. Furthermore, the solitary cells are "infested with insects, roaches and crickets, and infested also with rodents." Exhibit B at 144. As of September 30, 2026, Mr. Van Winkle observed dozens of dead crickets in and outside of his cell as well as water bottles filled with urine.

4. The ADCRR has even recently removed Mr. Van Winkle's access to colored pencils and other art supplies – an arbitrary decision, as the ADCRR had previously provided him with colored pencils for his artwork with no incident. To the contrary, Mr. Van Winkle's artwork has earned him entry into the celebrated program Beauty Behind Bars, an art program run by people of color who develop exhibitions in the Washington D.C. area. Exhibit C, Beauty Behind Bars ("Beauty Behind Bars

presents a collection of evocative, poignant, and beautiful pieces created by incarcerated artists, each a powerful meditation on resilience, hope, and the human capacity for change . . . Each piece challenges stereotypes and the all too unforgiving narratives about incarcerated persons. They bear witness to the transformative and redemptive power of art, even in the most inhuman of conditions"); Exhibit D, Artwork of Pete Van Winkle.

5. Since his renunciation and debriefing, Mr. Van Winkle has submitted grievances to the ADCRR concerning his classification status and conditions of confinement, exhausting his administrative remedies. The ADCRR has denied all relief, while also repeatedly memorializing in its written documents that Mr. Van Winkle has demonstrated "positive behavior," Exhibit E at 26, Restrictive Housing Forms; has maintained the highest level of privileges – Phase 3, Step 3, *id.* at 11; is "courteous and well-behaved," *id.* at 18; and has repeatedly completed the goals of his Restrictive Housing Case Plans. *Id.* As of his 180-day review on January 23, 2024, ADCRR wrote: "Van Winkle has done all tasks that needed to be done to meet the terms of his case plan . . . He has exhausted all of his options in order to reduce

in custody. He has remained disciplinary free and is programming, and has met the terms of his individual case plan. Van Winkle demonstrates a positive attitude and good behavior." *Id.* at 26.

6. Mr. Van Winkle's placement in solitary confinement remains indefinite. Despite the repeated requests of Mr. Van Winkle and undersigned counsel, the ADCRR has refused to provide Mr. Van Winkle with a pathway out of solitary confinement. He currently has fewer privileges today than before he renounced his gang affiliation and completed the debriefing process.

7. Moreover, the ADCRR has given numerous conflicting reasons for his continued solitary confinement. These reasons include: (1) a Do Not House With (DNHW) another inmate – though Mr. Van Winkle has agreed to mediate, *id.* at 15, 32, 33; (2) assaultive behavior, *id.* at 16; (3) a lack of housing, *id.* at 15 ("[t]eam agreed that Vanwinkle has limited options on housing, which is keeping him at Browning" and "housing is limited for death row"); (4) his classification as max, *id.* at 32; (5) his debriefing was in progress, *id.*; and (6) that the placement constitutes "Protective Segregation." *Id.*

8. Through this action, Mr. Van Winkle seeks a declaration that Defendants' conduct violates 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution. Mr. Van Winkle seeks declaratory and injunctive relief as fashioned by this Court to provide relief from the mental and physical impacts of his indefinite solitary confinement. The relief Mr. Van Winkle seeks is structural in nature and involves changes to the policies and procedures set and controlled by Defendants.

9. Mr. Van Winkle now brings this action for declaratory and injunctive relief under 42 U.S.C. § 1983.

**<u>JURISDICTION AND VENUE</u>**

10. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, which authorizes federal courts to decide cases arising under the Constitution, laws, or treaties of the United States; 28 U.S.C. § 1343(a), which authorizes federal courts to hear civil cases brought under 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

11. Venue is proper in this Court under 28 U.S.C. § 1391(b) because all

defendants are residents of the State of Arizona and live in the District of Arizona. A substantial part of the events or omissions giving rise to the claims brought by Mr. Van Winkle have occurred in this district.

**PARTIES**

12. Plaintiff Pete Van Winkle is incarcerated in the Browning Unit of the Arizona State Prison Complex (ASPC) under the Arizona Department of Corrections, Rehabilitation, and Reentry (ADCRR).

13. Defendant Robert Winfrey is the Warden of the Eyman Complex at the ADCRR. He is responsible for the operation of ASPC-Browning and for the welfare of the incarcerated people of that prison. He is sued in his official capacity.

14. Defendant Ryan Thornell is the Director of the ADCRR. He is responsible for the operation of correctional institutions across the state and the people housed in these facilities. Mr. Thornell is sued in his official capacity.

15. Defendant ADCRR is the agency in Arizona charged with housing incarcerated people and is responsible for Mr. Van Winkle's conditions of confinement.

## FACTUAL ALLEGATIONS

16. Mr. Van Winkle's path towards rehabilitation and redemption has been a thirty-year journey, beginning with his first contact with the juvenile justice system at age fourteen and characterized by advances and setbacks commonly seen in those who are incarcerated at a young age and pushed into prison gangs. *See* E. A at 10 ("entering prison as a young adult is an exceptionally difficult transition" and "joining a gang is one common way of adapting" because "[i]t addresses the need for belonging, protection, and status in a setting that removes all three"). Because Mr. Van Winkle's institutional history is central to his claims, his background is summarized below.

### *A. Background*

17. Mr. Van Winkle has been incarcerated for nearly his entire life. His contact with the juvenile justice system began when he was only fourteen years old. At that time, Mr. Van Winkle had already developed an addiction to drugs and alcohol, driving his behavior that led to his involvement with the juvenile courts.

18. By fifteen, when Mr. Van Winkle was in the eighth grade, he realized he had a

substance abuse problem and sought support from a social worker at his school, who advised him that he needed help to get sober. Exhibit F, Letter from Jeanne McGraw at 2 ("Another time [Pete] contacted me on a week-end on my emergency number and I remember that he was at a phone booth somewhere asking for help so he wouldn't make a bad decision and it was particularly about trying to stay sober and cope."); *id.* at 1 ("He did fairly well at school as he liked the staff and we liked him."). Two days after first meeting with the social worker, Mr. Van Winkle was caught with a beer by his probation officer. *Id.* He had tried to call the social worker that day, but she had been unavailable. *Id.* At that point, Mr. Van Winkle told his parents about his addiction to alcohol, and he contacted his probation officer and shared the same.

19. After Mr. Van Winkle initiated outreach to his school and probation officer, he started attending Alcoholics Anonymous meetings and began substance abuse counseling at the school. *Id*. at 2. He also signed up for the Young Marines program. But Mr. Van Winkle's addiction was already deep-seated and he struggled with his sobriety. Further, Mr. Van Winkle was diagnosed with ADHD and prescribed

Dexedrine, a stimulant, which he used to take to stay awake when he was exhausted from drinking. Soon, Mr. Van Winkle began to use acid, methamphetamine, and cocaine.

20. On October 19, 1998, when Mr. Van Winkle was sixteen years old, his probation was violated for using crystal methamphetamine. Exhibit G, 10/19/1998 Maricopa County Juvenile Probation Disposition. Mr. Van Winkle's addiction continued to spiral, leading to juvenile charges of theft, criminal damage $250, and simple assault for a fist fight at a school for troubled kids.

21. Even as a child navigating the haze of addiction, however, Mr. Van Winkle desperately wanted to get better. On December 16, 1999, when Mr. Van Winkle was seventeen, he called his juvenile probation officer, asking for help. As the probation officer wrote: "I feel Pete knows himself better than we do. He called me for this review because he feels out of control and he felt he should be detained pending his hearing on the 25th." Exhibit H, 1/22/1999 Maricopa County Juvenile Probation Report.



22. The following month, in January 2000, Mr. Van Winkle's juvenile probation officer wrote:

> Pete has kept his appointments with this officer, but has been using cocaine and marijuana regularly…Pete has received his G.E.D. and is currently working for a construction company. Pete is very intent on joining the service as soon as he is released from probation. The juvenile is quite concerned about the fact that this new charge will prevent him from being able to enlist in the military.

Exhibit I, 1/21/2000 Current Information Report at 2.

23. At age seventeen, Mr. Van Winkle was charged with disorderly conduct and ordered detained until his eighteenth birthday. On January 25, 2000, Mr. Van Winkle's probation officer explained:

> Pete admitted to this office that he has been using cocaine and marijuana daily since learning of the new charge against him . . . The juvenile told this officer that he is willing to go to detention and almost seemed to want to be detained . . . This officer believes that the juvenile is asking for help by his suggesting he be detained for the drug use.

*Id.* But two months later, Mr. Van Winkle was still fighting addiction. On March 29, 2000, the juvenile probation officer wrote: "The juvenile has tested positive for cocaine and THC every week for the past 5 weeks." Exhibit J, 3/29/2000 Current Information Report.

24. Two months before he turned eighteen, in February 2000, Mr. Van Winkle was charged with a Narcotic Drug Violation and Trafficking in Stolen Property, for which he was sentenced to five years' incarceration. Exhibit R, Disciplinary Reports at 1-2.

25. The following month, seventeen-year-old Van Winkle was also charged with Trafficking in Stolen Property. *Id.*

26. In April 2000, before he was convicted and sentenced on the above offenses, Mr. Van Winkle was sent to the notorious maximum security Madison Street Jail, also known as the "Horse Shoe" run by Sheriff Joe Arpaio. *Id.* There, incarcerated teenagers and pretrial detainees like Mr. Van Winkle were dumped into confined

spaces with adults convicted of seriously violent offenses, including capital murder. Mr. Van Winkle himself was forced onto chain gangs and inmates were required to wear pink underwear beneath a zebra-striped uniform. Exhibit K, Madison Street Jail News Articles ("Chain gangs of men, women and soon juveniles are dispatched to gather trash, paint curbs, and bury the indigent."). Sheriff Arpaio also "f[ed] prisoners aging, surplus food" and "hous[ed] detainees in [uncooled] military tents" in "Arizona's blistering summer." *Id.*

27. Mr. Van Winkle spent his first days of incarceration in one of those tents. As one Professor of Justice Studies at Arizona State University put it: "By adding punishment on top of punishment, to make them pay for going to prison, is absurd. The evidence is overwhelming that treating these individuals poorly in prison makes them even worse when they get out . . . ." *Id.* The ACLU of Arizona added: "[T]his is clearly punishment by humiliation. The exposure to someone who has been arrested can have a profound impact on their lives." *Id.* Indeed, the conditions were so bad that the U.S. Department of Justice, the Office of Risk Management, and the Office of the County Medical Examiner revealed that from 1996-2015 nearly 160 people

died in Arapaio's jails, including the Horse Shoe, and an astonishing 25% of those who died committed suicide by hanging. *Id.*

28. At the time teenaged Van Winkle entered the jail, it had already been plagued by brutality, suicides, and wrongful deaths, including that of Scott Norberg, who was asphyxiated to death during a struggle with the guards. Specifically, witness accounts asserted that Norberg was struggling in a black metal "restraint chair," his mouth gagged with a towel, his arms handcuffed behind the chair, his body zapped repeatedly with stun guns as his face turned a purplish blue and he suffocated to death. *Id.* For teenaged Mr. Van Winkle, he witnessed a murder shortly after arriving at the facility. *Id.*

29. In fact, Leroy Cropper, another inmate who is currently on death row – but who is *not* housed in solitary confinement – was at the Madison Street Jail awaiting transport to death row for an institutional homicide (stabbing a Perryville Corrections Officer to death) when he attacked another inmate, stabbing him twice in the neck and once in the shoulder. *Id.*

30. Additional incidents that took place in the jail in which young Mr. Van Winkle

was confined for a drug and shoplifting violations include the July 2001 severe beating of a man who ultimately lost his spleen, *id.*; the August 2001 death of a mentally handicapped pre-trial detainee who was placed in the brutal restraining chair, *id.*; and the January 2002 hostage standoff in the jail where a man broke through a cinder block wall and took another inmate hostage with a piece of rebar. *Id.*

31. After a brief stint in the Horse Shoe, Mr. Van Winkle was sent to Estrella Jail, where he was placed in lockdown, and later, Towers Jail. He was released from jail in September 2000, but was charged with theft in October 2000 for shoplifting. Exhibit R at 1-2.

32. Mr. Van Winkle was not sentenced for any of the above three offenses until May 2001, when he was nineteen years old. At that time, he was sentenced to five years incarceration for the narcotics charge, seven years incarceration for trafficking stolen property, and 1.5 years incarceration for shoplifting. In other words, Mr. Van Winkle was sentenced to a total of 13.5 years for three non-violent offenses he committed as a child.

33. In a letter from his former teacher at Arizona Project Challenge, she

explained: "I [] became aware of his personal desire to be successful and that he has not often had the support in his life to . . . meet the full potential of what he can become;" however, while Mr. Van Winkle "did [] some great things while being here, one of which was getting his GED," the "program was not what he needed." Exhibit L, Letter from Jeniffer Tanner. Specifically, "He should not have been sent to Project Challenge for rehabilitation services," because "we could not offer him services which he desperately needed" – namely, addiction treatment services. *Id.* The teacher continued, "the Arizona Criminal Justice System and Project Challenge had an opportunity to advocate and assist this young man in making a better life for himself. I believe he was failed by both." *Id.*

34. Thus, in June 2001, Mr. Van Winkle was thrust into the violent world of adult prison. He was a 150-pound skinny teenager with alcohol and substance abuse issues, only two months past his nineteenth birthday. Exhibit M, Memorandum to Honorable Thomas Dunevant III ("This is defendant's first felony as an adult . . . Defendant needs to learn that now he is an adult and he will be dealt with as an adult.")

35. In fact, the staff at the Reception and Treatment Center at the ADCRR gave

Mr. Van Winkle a score of 4.6 for suicidal concerns, *9.4 for victim proneness*, and only 4.5 for violence risk. Exhibit N, 2001 ADOC Records. He also received the minimum scores for extent of violence in current offense, violence history, and confinement history. *Id.* At that time, he was classified as medium custody and moderate risk. *Id.* Two months later, in August 2001, he was reclassified as minimum custody and lowest risk. *Id.*

***B. ADOC Institutional History and Introduction to the Aryan Brotherhood***

36. When Mr. Van Winkle first entered the Arizona Department of Corrections, he was sent to ASPC-Douglas. There, Mr. Van Winkle quickly learned about the dangers of prison, just as he had been forced to navigate the violent jail environments. At the time, ASPC-Douglas was in the middle of a race war, and Mr. Van Winkle witnessed several rapes early on in his incarceration – a brutal reminder of the need for protection, status, and community.

37. It was here that Mr. Van Winkle was introduced to the Aryan Brotherhood. As expert David Pyrooz explains: "There is a well-documented pattern of adjustment [to prison] being the most difficult in the first months and years of confinement,

especially for young adult prisoners." Exhibit A at 2. "For example, a study of 2,158 men admitted to prison in Arizona in 1996 found that younger prisoners were more likely to commit violent misconduct in their first three years of incarceration." *Id.*

38. In particular, "[i]t is not uncommon for prisoners to turn to gangs while incarcerated," as "[g]angs occupy a central place in the social order or prison systems." *Id.* In fact, "[o]fficial records indicate that about 15 percent of prisoners in the United States are affiliated with gangs," though surveys of prisoners suggest the number is much higher. *Id.* Importantly, joining a prison gang "is a feature of the prison, not evidence of racial animus. Prisoners are expected to affiliate with their racial/ethnic group regardless of whether they belong to a gang." *Id.* The reasons that young people frequently join gangs in prison include "belonging, whether friendship, loyalty or trust, or a sense of family ties," and protection, which is "a common motivation, which exerts greater salience in periods where violence is more common, particularly inter-racial violence." *Id.* at 3.

39. At Douglas, Mr. Van Winkle met an older man who was affiliated with the Aryan Brotherhood. The man took young Pete Van Winkle under his wing, recruiting

him into the gang. Mr. Van Winkle saw the Aryan Brotherhood as a shield to protect him against the rampant violence, but also as a family. The recruiter also emphasized the role of education within the gang's constitution and encouraged the teen to pursue academic knowledge – something that Mr. Van Winkle yearned for, but that had been hampered by his drug and alcohol addiction as a teenager, which led him to stop attending school.

40. In 2001, Mr. Van Winkle received three violations as a result of two incidents, including assault with a weapon and, later, physical assault and threatening with harm. Exhibit R at 1-2; Exhibit O, 2002 ADOC Records at 1. As a result, he was reclassified as close custody, high risk in November 2001 and was transferred to ASPC-Yuma. *Id.* Mr. Van Winkle was still nineteen years old.

41. For the next year, Mr. Van Winkle maintained clear conduct and was violation-free. Exhibit P, ADCRR Inmate Search.

42. In March 2002, Mr. Van Winkle was transferred from ASPC-Yuma to ASPC-Eyman. Exhibit O. In June, he asked staff: "I would like to go to central unit so I can program." *Id.* at 4. Over the course of the next year, Mr. Van Winkle's

custody status decreased, from to maximum/high custody in July 2002, then maximum/moderate in December 2002. *Id.* at 7.

43. In December 2002, Mr. Van Winkle received a violation for hindering staff because he refused to return his library slip. Exhibit P, ADCRR Inmate Search at 2. This was his only violation in a twelve-month period. *Id.*

44. In 2003, Mr. Van Winkle received only two disciplinary infractions, both for fighting. Subsequently, Mr. Van Winkle spent another twelve months violation-free. *Id.*

45. In 2004, Mr. Van Winkle was incarcerated at ASPC-Florence. In August of that year, he received two violations, one for possession of a weapon in August and one for physical assault in November. *Id.*

46. Three months later, in February 2005, Mr. Van Winkle was transferred to the Browning Unit of ASPC-Eyman, where he is now housed. In other words, at twenty-two years old, Mr. Van Winkle was placed in solitary confinement/total lockdown at the most restrictive facility in the Arizona prison system.

47. Mr. Van Winkle spent over a year violation-free before receiving a violation

for loss/destruction of property in December 2005. *Id.* It was his only violation for all of 2005. *Id.*

48. Mr. Van Winkle continued to maintain disciplinary-free behavior for all of 2006 and 2007. *Id.* However, in 2007, Security Threat Group (STG) information was added to his profile due to his affiliation with the Aryan Brotherhood. *Id.*

49. After a year and a half of clear conduct, Mr. Van Winkle was released from ADOC in September 2007 and placed on community supervision. *Id.*

50. For the next five months, Mr. Van Winkle remained on parole and maintained his sobriety, passing all of his monthly drug tests. However, by the end of February, Mr. Van Winkle relapsed and began using methamphetamine heavily. Within two weeks of relapsing, he was arrested and charged with attempted murder and sent to the Maricopa County Jail. *State v. VanWinkle*, 229 Ariz. 233 (2012).

51. On May 1, 2008, Mr. Van Winkle was charged with the beating death of another inmate, Robert Cotton, while housed at the Maricopa County jail. *State v. VanWinkle*, 230 Ariz. 387 (2012). He was capitally-charged and proceeded to trial. *Id.* On November 17, 2009, Mr. Van Winkle was sentenced to death. *Id.* He was then

transferred back to ADCRR and reclassified as Maximum/Highest. *Id.*

52. After his sentencing, Mr. Van Winkle remained violation-free for the entirety of 2010. Exhibit R at 1-2. His custody was therefore decreased to Maximum/High in February 2010. *Id.*

53. In 2011, Mr. Van Winkle received a single violation for assault when he threw an unknown substance on another inmate. *Id.* at 3. There were no witness statements used, but staff concluded: “Based on information reviewed I find it more likely than not the offense happened.” *Id.* at 4.

54. The following year, in October 2012, Mr. Van Winkle received a single violation (minor) for tampering with security or safety devices when he was directed to remove a piece of cardboard from his light and he did not comply. *Id.* at 6. He remained violation-free for the next 12 months. *Id.*

55. Similarly, in 2013, Mr. Van Winkle received only one violation for disorderly conduct on November 2, 2013. *Id.* Mr. Van Winkle pleaded guilty and said, “I f**cked up.” *Id.* at 8. His penalty consisted of 30 days parole class III; 30 hours extra duty; 30 days loss of privileges. *Id.*

56. Nine months after the violation for disorderly conduct, on August 13, 2014, Mr. Van Winkle was given two disciplinary violations arising out of the same incident: participation in a riot and assault on staff that did not involve serious injury. *Id.* at 11. Although the infraction was for participation in a riot, only one other inmate was involved when, five hours after Mr. Van Winkle's charge, the other inmate hit an officer's face shield with a homemade dart. *Id.*

57. From August 13, 2014, until January 3, 2018 – nearly three and a half years – Mr. Van Winkle maintained clear conduct and was violation-free. *Id.*; Exhibit P at 2. During this period of time, Mr. Van Winkle invested in his own education and rehabilitation, completing ten Commitment to Change (C2C) programs, which are therapeutic and behavioral interventions that build prosocial values, improve social skills, and help participants transition back into the general prison population. Mr. Van Winkle completed programs on social values, responsible thinking, self-control, feelings, socialization, and core skills. Exhibit P at 3.

58. In 2017 alone, Mr. Van Winkle took the following courses: Values and Personal Responsibility; Criminal Thinking; Child Development & Parenting; and

Attitude & Beliefs. *Id.* In total, Mr. Van Winkle completed one program in 2014, four programs in 2015, four programs in 2016, and five programs in 2017. *Id.* By September 2017, Mr. Van Winkle's custody had been reduced to Maximum/High. *Id.*

59. Yet Mr. Van Winkle still struggled with drug addiction, prompting a backslide in his progress. Consequently, in January 2018, Mr. Van Winkle received two violations for possession of a weapon and positive test or refusal of UA. Exhibit R at 12; Exhibit P at 2. The weapon was neither in Mr. Van Winkle's cell nor in the prison but was instead found in legal property in long-term storage. *Id.*

60. Mr. Van Winkle was determined to start again. Two months after the 2018 violation, he re-enrolled in and completed the C2C programs Responsible Thinking and Self Control. Exhibit P at 3. He also completed Client Cognitive Skills the same year. *Id.*

61. In 2019, Mr. Van Winkle focused on addressing his long-standing struggle with addiction, enrolling in and completing Drug Education; Relapse Prevention; Change Company Challenge/Criminal Lifestyle, and Change Company Challenge/Violence Prevention. *Id.* As a result, Mr. Van Winkle was *violation-free*

for the entirety of 2019 and 2020 (as well as eleven months of 2018). *Id.*; Exhibit R at 1-2. And yet, Mr. Van Winkle was still affiliated with the AB – his last tie to illegal activity in prison – which threatened to derail all of his hard work and progress.

62. Mr. Van Winkle's reticence to renounce his AB affiliation was unsurprising in given the risks: the constitution of the gang unequivocally states that the gang is "blood in" and "blood out." In other words, "If you want out of the Aryan Brotherhood . . . you have to be willing to pay the ultimate price." Exhibit Q, Articles on Aryan Brotherhood. As one former AB member explained, when he decided that he wanted to leave the gang, his "brothers beat him with metal locks wrapped in socks and stabbed [] with ice picks." *Id.* He was hospitalized and transferred to another prison, but he was attacked again. *Id.* Moreover, while the AB is "run from inside prisons," it "exert[s] power far beyond their walls," placing loved ones at risk. *Id.*

63. In 2021, Mr. Van Winkle continued his multi-year pattern of remaining violation free. Then, in December 2021, Mr. Van Winkle and his co-defendant

Hampton were charged by the ADCRR with an institutional homicide.[1] Interestingly, no criminal charges were filed until on or about June 2025, and trial in that case is pending. Case No. S-1100-CR-202501135.

***C. Placement in Restrictive Housing and Conditions of Confinement***

64. Following the ADCRR charge, Mr. Van Winkle was placed in Enhanced Management Housing Status, which has "a policy requirement of successful participation in each step for 90 days to be eligible for step advance." Exhibit E at 2. Mr. Van Winkle's phase level dropped from Step 3 (the best) to Step 1 (the lowest/bottom) and he was instructed: "To advance your status you must:" (1) participate in programs; (2) "maintain a good discipline violation record" with "no major or minor violations for six straight months." *Id.*

65. At this point in time, Mr. Van Winkle realized that he needed to change his life for good. He started by working the steps of the program, beginning in January 2022 with two self-study workbooks: Responsible Thinking and Self Control. *Id.* ADCRR

[1] Mr. Van Winkle is charged with co-defendant Tracy Hampton with the murder of death row inmate Kenneth Wayne Thompson, who was incarcerated for the 2012 hatchet and knife murders of his sister-in-law and her fiancé before pouring acid on their bodies and setting the home on fire. *State v. Thompson*, 252 Ariz. 279 (2022).

staff informed him that "Max Custody Inmates are required to complete these packets to be eligible for advancement in the Step Program." *Id.*

66. Mr. Van Winkle remained violation-free for the entirety of 2022, and his commitment to working the program paid off – on June 30, 2022, his "phase level has been changed from Phase 1 to Phase 2." *Id.* at 7. ADCRR staff praised his efforts:

> Congratulations! Due to your positive behavior in all aspects of your program plan, you have met the criteria to advance to phase 2. You have now earned increased visits, phone calls, store funds, etc. You also have increased responsibility and expectations while in Phase 2. To maintain your status you must maintain excellent results in all areas. We encourage you to not only continue your positive behavior, but to increase your effort to become a civil and productive person and put it into daily practice. Specifically, look for opportunities to get involved in restorative justice activities.

*Id.* The staff instructions for further success remained the same: to maintain your status you must participate in programs and maintain a good discipline record with no violations for six straight months. *Id.*

67. On August 19, 2022, the ADCRR completed a Maximum Custody Placement Recommendation/Approval:

> Reason for reclass: Max Custody Review Inmate Van Winkle [] was initially placed in Enhanced Management Housing Status (EMHS) on 12/29/2021 due to the death of an inmate…Since his arrival to EMHS, Inmate Van Winkle has participated in all programming available and has advanced to Step 3. Inmate Van Winkle has remained disciplinary free.

*Id.* at 4.

68. Mr. Van Winkle received a single violation for threatening or intimidating in February 2023, when he was being strip searched. He was penalized by 30 days loss of visits and 30 days loss of privileges. *Id.* Realizing his error, Mr. Van Winkle redoubled his efforts in the program and, for the next ten months, he was violation free. Exhibit R at 1-2.

69. On July 24, 2023, Mr. Van Winkle had his re-class and "it was finalized to max custody on 8/15/2023." Exhibit # at 27. ADCRR staff wrote: "You were approved max custody per OSB administration. You have continued to show positive behaviors, by staying in 704 compliance and remaining disciplinary free." *Id.*

70. And yet, by December 2023, Mr. Van Winkle had not been transferred out of Enhanced Housing, despite having only one violation in nearly two years and completing all of his required programming. At a review of his housing on December

28, 2023, ADCRR staff conceded:

> Van Winkle has done all tasks that needed to be done to meet the terms of his case plan. He asks why he is still at A27. He has exhausted all of his options in order to reduce in custody. He has remained disciplinary free and is programming, and has met the terms of his individual case plan. VanWinkle demonstrates a positive attitude and good behavior.

*Id.* at 26. At the time, he had worked his way up to Phase 3, Step 3. Nevertheless, staff concluded: "You were approved max custody per OSB administration." *Id.*

71. The following month, on January 23, 2024, Mr. Van Winkle had another 180-day review and was again finalized for maximum custody. Reviewing ADCRR staff again acknowledged Mr. Van Winkle's commitment:

> Van Winkle has done all tasks that needed to be done to meet the terms of his case plan…He has exhausted all of his options in order to reduce in custody. He has remained disciplinary free and is programming, and has met the terms of his individual case plan. Vanwinkle demonstrates a positive attitude and good behavior. VanWinkle kindly declines to sign.

*Id.* at 30.

72. On June 19, 2024, Mr. Van Winkle participated in another Restrictive Housing Case Plan covering the period from June 19 to July 19, 2024. *Id.* at 10. The first goal of the plan was: "Keep a daily journal of persons, situations, and other triggers of

anger; record thoughts, feelings, and actions taken." *Id.* This goal was "in progress" at the time of the review – in fact, Mr. Van Winkle adhered to his daily journaling routine to such an extent that he needed another composition notebook. *Id.* Goal 2 centered on "Personal Boundaries," and staff noted that Mr. Van Winkle had completed his previous goal and would "now focus on 'Personal boundaries print-out.'" *Id.* As for Goal 3, staff noted: "Inmate completed this goal, and would like to work on 'The Impact of Crimes on Victims' book." *Id.*

73. By this time, however, Mr. Van Winkle was starting to lose hope that ADCRR would ever move him out of solitary confinement to less restrictive housing. The ADCRR staff themselves realized that the prolonged solitary confinement – in spite of all of his progress – was taking a toll on Mr. Van Winkle's mental health. Indeed, staff memorialized that Mr. Van Winkle "expressed a reticence to go 'all in' on something that is not expected to yield any tangible results." *Id.* at 11. They continued, "[Mr. Van Winkle] is frustrated due to talking about a case plan every month yields no incentive. The incentives remain the same regardless of his personal development." *Id.*

74. Further, ADCRR staff indicated that there was a Do Not House with a single inmate in Rynning, explaining:

> [Mr. Van Winkle] has attempted to mediate DNHW at Rynning Unit, but the other inmate wishes to not mediate, leaving him stuck at Browning. Inmate also stated that central office continues to violate policy by not allowing [him] to receive the incentives that he has earned, and deserves.

*Id.* at 11.

75. Again, the ADCRR documented Mr. Van Winkle's plight and the resulting impact on him, explaining:

> [Mr. Van Winkle] appears discouraged that in spite of doing everything required of him in order to enable him to go to lower custody, he is still remains at MAX. Inmate appears discouraged that they continue with programming and good behavior in order to be classified lower custody and in the end only to be overridden to MAX.

*Id.* Finally, the reviewing officer added, "Displays pro-social behavior. Recommend increasing privileges to the extent possible." *Id.* Mr. Van Winkle was still a Phase 3, Step 3. *Id.*

76. Throughout this period, Mr. Van Winkle remained in his small solitary cell, cut off from community, programming, and work opportunities and falling deeper

into depression. In August 2024, Mr. Van Winkle received one violation – assault on an inmate during a fist fight involving six other inmates. Consequently, he was sent back to Phase 2/Step 1; however, staff "recommended that the inmate maintains his current privileges at this time." *Id.* at 15.

77. In July 2024, Mr. Van Winkle's 180-day review was pending. The COIII recommended maximum custody but expressly stated that this was due to the Do Not House. *Id.* The COIII compassionately explained:

> Inmate Vanwinkle is still discouraged, due to the fact he remains disciplinary free, and gets no incentives. He asked about receiving store, as if they were on a lower yard, since they won't allow him to reduce in custody.

*Id.* The officer continued:

> COIII inquired about the inmate's wants/requests to DW, and pod time was not on the table as of right now. He did say that he is working on the store concern, just needs higher approval. Inmate does appear to be discouraged still.

*Id.*

78. On August 8, 2024, Mr. Van Winkle's review classification was finalized as Maximum custody, with the next 180-day review due by January 25, 2025. *Id.* Again,

Mr. Van Winkle buckled down and made progress. By October 1, 2024, he was increased from phase 2/step 1 to step 2. *Id.*

79. Another Restrictive Housing Case Plan took place on December 10, 2024, covering the period from October 1, 2024 to December 10, 2024. *Id.* at 13. Notably, the goals remained largely the same. Goal 1 consisted of journaling and staff noted: "Inmate works on goal regularly" and was so devoted that he had to request multiple notebooks. *Id.* at 14. Mr. Van Winkle reiterated his concern that when he met all of his goals and programming, he still would not be moved out of maximum custody, stating: "What incentives can we get for positive behaviors, since we can't get the incentive of moving out of MAX custody?" *Id.* As for the staff, the "team agreed that Vanwinkle has limited options on housing, which is keeping him at Browning." *Id.* They concluded: "Inmate is currently phase 2, step 3" and would "Maintain current privileges." *Id.*

80. Mr. Van Winkle received his final violation in January 2025. That final incident involved a fight between Mr. Van Winkle and another inmate, Garcia, during which a staff member received a cut to his left thumb. Consequently, Mr. Van Winkle

received a violation for assault on staff that did not involve serious injury. Exhibit R, Disciplinary Report. Mr. Van Winkle has since been housed in the same unit as Garcia with no further issues.

81. Following the January 2025 violation, Mr. Van Winkle fell back to Phase 2/Step 1. Mr. Van Winkle again enrolled in and completed several C2C programs, including Substance Abuse, Peers and Responsible Thinking. On January 14, 2025, staff wrote that "Vanwinkle is courteous and well behaved," despite reverting to "step 1 upon being assigned to RSHP." *Id.* at 18.

82. On January 28, 2025, Mr. Van Winkle was awarded step 2, with step 3 to be achieved no earlier than February 28, 2025 and "after completion of start/now programming booklets." The staff added: "Last reclass finalized for max on 8/8/24, 180 day review initiated on 2/10/25, awaiting warden recommend." *Id.*

83. On February 10, 2025, Mr. Van Winkle's 180-day review was initiated because his reclass on September 6, 2024 had been canceled. *Id.*

84. On March 11, 2025, Mr. Van Winkle was awarded Step 3. *Id.*

85. On March 14, 2025, staff noted that his reclass in February 2025 was

administratively canceled – the second time in a row – and Mr. Van Winkle was "disappointed at not graduating the program but is coping well." *Id.*

86. By April 10, 2025, Mr. Van Winkle was Phase 1, Step 3, with his "last classification finalized on 8/7/24" – eight months earlier. *Id.* As Mr. Van Winkle approached a year without any 180-day review, he remained in solitary confinement.

***D. Renunciation of the Aryan Brotherhood and Debriefing***

87. In August 2025, Mr. Van Winkle made the most transformative decision of all – he renounced his 20-year affiliation with the Aryan Brotherhood. Although renouncing is a profoundly dangerous and life-altering decision, it is also relatively common as individuals age in prison and want more out of life – education, employment, family, community. Dr. Pyrooz explains the results of one study that showed "about two-thirds of those with a gang history had left [the gang]" while incarcerated. Ex. A at 4. "In Arizona prisons in the late 1990s, 22 percent of validated gang affiliates applied to renounce, which was more common among older than younger prisoners." *Id.*

88. Moreover, Dr. Pyrooz explains:

> Leaving a gang is a process, not an event. It is something that unfolds over time rather than a discrete action. It is not unlike divorce, religious apostasy, or retirement; spouse, believer, and work are roles that are central to individual identity. These roles bring meaning to lives and their removal is neither immediate nor linear. This is why a "role exit" model has been applied to disengagement for gangs, and it includes the motivations and methods for leaving. "First doubts" about current roles capture the initial seeds of doubt. These grow into "anticipatory socialization," or the consideration of different roles. Both of these stages are internal to the person, a cognitive questioning and repositioning of identity. "Turning points" are significant actions that prompt internal identity reconstruction and continue outward to take formal steps to change. "Post exit validation" communicates that change to "ex" or "former" status to stakeholders of one's decision: the gang, rival gangs, the prison system, and other institutions. This is critical because talk is cheap while action is costly.

*Id.* The biggest motivations for leaving a prison gang are "disillusionment with the gang" and family. *Id.*

89. There is robust evidence that gang affiliation is associated with higher rates of misconduct; likewise, when a prisoner decides to renounce his gang affiliation, prison adjustment and behavior improves. *Id.* at 4-6. For example, "gang affiliates admitted to prison in Arizona in 1996 were about twice as likely to be written up for

a violent disciplinary infraction in their first three years in prison." *Id.* at 6. And "[l]eaving a gang corresponds with reductions in criminal offending, victimization, and substance use and improvements in criminogenic attitudes and emotions and mental health." *Id.* One longitudinal study of incarcerated active gang members in Philadelphia and Phoenix, for instance, revealed that "disengaging from gangs corresponded with fewer antisocial peers, less unstructured socialization, reductions in victimization, and greater self-restraint, which in turn corresponded with reductions in criminal offending." *Id.* A similar study of juvenile detainees who were active gang members also "showed that leaving a gang improved mental health functioning and reduced clinical diagnoses, including alcohol and drug dependencies." *Id.* And "[q]ualitative interviews with former gang members describe leaving the gang as a release of pressure or weight," as "[t]hey are no longer bound to the rules of the gang and are free to pursue a life of their choosing." *Id.* While "[t]his can be difficult, particularly for those who have been subject to the liabilities and obligations of the gang for many years," "[t]here is a growing number of accounts of former gang members who left behind their gang to secure education,

employment, family, and civic engagement." *Id.*

90. On August 10, 2025, Mr. Van Winkle "made it known to the Browning Unit SSU Staff that I would like to renounce . . . the Arizona Aryan Brotherhood." Exhibit S, Inmate Letters and Informal Complaints at 2. Yet the ADCRR failed to act on Mr. Van Winkle's decision until he prompted them, writing:

> I was ultimately isolated in 3G23. I filed out the debriefing packet given to me by [staff]. Since then, nearly two months have lapsed . . . and I still have not even been debriefed. Some time at the beginning of August [staff] told me he 'would pull me out on August 25th.' He apologized when that day came and went. To date, I still have not been debriefed. I have not had access to any of the incentives like closed custody store, or told how and what my pathway out is. I'm not looking to stir the pot, I'm just looking for some real answers.

*Id.*

91. On August 28, 2025, while still awaiting his debriefing, Mr. Van Winkle participated in another Restrictive Housing Case Plan, covering the period from July 30, 2025 through August 28, 2025, which was conducted by COIII Tassone. Exhibit E. The case plan form indicated: "The purpose of this case plan is to discuss goals, time frames and expected behaviors to return to a less restrictive housing

environment." *Id.* The form also stated:

> Expected behaviors include: respectful interactions with staff and your peers, the following of all ADCRR policies and procedures, completing goals chosen from the menus below, remaining disciplinary free, attending and appropriately participating in any assigned programming.

*Id.* And finally:

> You will have frequent contact with your case manager and MDPT team. You are expected to speak with them regarding progress towards your goals, suggestions for returning to a lower custody housing area and to ask any questions about goals or expectations you are unsure about.

*Id.* The reason given for Mr. Van Winkle's continued restrictive housing placement on this particular plan was "disruptive/ assaultive behavior." *Id.*

92. The goals on the plan were, as always, the same: (1) journal; (2) personal boundaries; and (3) maintain clear conduct. *Id.* Additional comments from ADCRR staff embraced Mr. Van Winkle's transformation: "COIII Tassone noticed a definite change in VanWinkles attitude, thought process, and demeanour. MDPT encouraged Van Winkle to follow through with the changes and self-development he is working on." *Id.* He continued, "VanWinkle is a Step 3 and there are currently no factors that require a decrease. Maintain Step 3." Nevertheless, "VanWinkle is currently in a 180

day review and classification recommendation was MAX custody at this time." *Id.*

93. On August 30, 2025, Mr. Van Winkle wrote another inmate letter: "I've asked that mitigation factors be considered in assessing whether or not my placement is appropriate." Exhibit S at 3. "If points generated begin phasing out at 2-3 years . . . How is it that 3 guilty tickets since 1-6-22 have given me 50 points? I've only had 3 tickets since 1-6-22 constitute as a 'chronic instability' to be on lower custody?! Many people are placed on a 4 yard with more tickets than this." *Id.* Addressing his mental health, he added: "How do I have a mental health score of a '3' when I've had minimal interaction with them and besides people with mental health should have more freedom as solitary confinement is not conducive to good mental health!" *Id.*

94. An undated Maximum Custody Placement Recommendation/Approval form addressing Mr. Van Winkle's renunciation and debriefing explained: "I/M Van Winkle is currently in the process of debriefing and must remain at Browning Unit during this process. I/M Van Winkle is currently a phase 2 step 3. He participates in his case plans by working on his goals." Exhibit T, Maximum Custody Recommendation/Approval.

95. Ultimately, after all of Mr. Van Winkle's dedicated actions, Deputy Warden Rogers allowed him but one privilege – art supplies ordered from the Blick store. And over the next several months, Mr. Van Winkle received various art supplies, from stencils to pastels to charcoal to colored pencils. Exhibit U, Art Supplies Records.

96. On November 24, 2025, Mr. Van Winkle successfully completed the debriefing process and was certified as renounced and debriefed. Exhibit S. Still, Mr. Van Winkle was not moved out of solitary confinement, nor did he receive any additional privileges.

97. Dr. Pyrooz explains: "Prison systems place gang affiliates in restrictive housing not because they needed it (i.e., protection) or earned it (i.e., disciplinary), but based on their *status* as gang affiliates." Ex. A at 8. "Policies supporting status-based placement in restrictive housing are now the exception rather than the norm in U.S. prison systems." *Id.* In Arizona, the ADCRR has "long held validated gang members in maximum custody on the basis of their status," but "[s]ince 2023, a court injunction in *Jensen v. Thornell* has limited how long anyone in Arizona can be

held in 22-hour isolation." *Id.*

98. What's more, "[p]rison systems do not make it easy to change classification or designation as a gang affiliate." *Id.* Rather than "maintain[] any strategy designed to support gang leaving," "[t]he policies and practices in place are mostly either renunciation or debriefing." *Id.* Beyond renunciation, "[d]ebriefing requires providing information about the gang . . . to prison authorities." *Id.* Both renunciation and debriefing "often involve a signed statement . . . an interview with authorities, and, in some systems, a period of observations (e.g., 6-12 months) and review of records (e.g., mail, phone calls, prisoner interactions) before reclassification occurs." *Id.*

99. Yet "Arizona sits at the demanding end of this continuum." *Id.* at 9. Specifically, "[u]nder Department Order 806, a validated member may renounce only by completing a formal debriefing. The person is moved immediately to designated housing, interviewed using a questionnaire, and a report is due within 30 business days." *Id.* "Those who succeed are placed in protective custody, without review or appeal, according to Department Order 805, but can be removed upon request or

administratively upon a prolonged investigative review. *Id.* This contrasts with the approach of other states, which "permit people to shed their gang designations without disclosing information about the gang." *Id.*

100. As Dr. Pyrooz explains: "Both debriefing and renunciation put prisoners in a liminal space, halfway in and out of the gang. This leaves them vulnerable to extortion, intimidation, and victimization." *Id.* Even more concerning, "debriefing represents a much stronger violation of gang norms and rules than renunciation; it is one thing to leave the gang, but something much different to provide incriminating information (i.e., snitch)." *Id.* And even if a prisoner successfully renounces and debriefs, "many former gang affiliates end up in special needs yards or protective custody, which offer greater freedoms than solitary confinement, but carry a lasting label and entail more restrictive conditions than the general population." *Id.*

101. Following Mr. Van Winkle's renunciation, he began to formally grieve his continued placement in solitary confinement. Immediately, he ran into his first obstacle – the tablet on which he was supposed to submit his grievance was not working. First, then, Mr. Van Winkle grieved his lack of access to even file a

grievance. He alleged that "unnecessary hardship is being placed on me in an effort to discourage me from pursuing the grievance process" and cited to the court's order in *Jensen v. Thornell* as well as D.O. 802, 1.9 and 1.13. Exhibit V, Grievances. On November 29, 2025, the ADCRR opened a formal grievance with respect to Mr. Van Winkle not being able to access the grievance process digitally. *Id.* at 3.

102. The Formal Grievance Response issued January 16, 2026, informed Mr. Van Winkle that the digital process for filing grievances was being "worked on" and that he would be informed when the process became active and able to be used. *Id.*

103. Meanwhile, on December 2, 2025, Mr. Van Winkle participated in another Restrictive Housing Case Plan for the period from October 28, 2025 to December 2, 2025. Exhibit E at 32. He was currently Phase 3 step 3. The plan documents the "Reason for placement" as "classified as Max" and "Other-DNHW." *Id.* The staff noted that Mr. Van Winkle "appears motivated or positive." *Id.*

104. The "Plan to reduce in custody and gain more privileges" instructed Mr. Van Winkle to: (1) remain disciplinary free, (2) participate in programming, and (3) "comply with debrief process, attend interviews and complete paperwork requested."

*Id.* The reviewing officer explained that Mr. Van Winkle had "cooperated with debrief process and has successfully completed this" on November 24, 2025. *Id.* Mr. Van Winkle had also remained violation-free and was completing his worksheets. Yet the ADCRR concluded: "VanWinkle is appropriately housed. He currently has 1 DNHW at C81 (Rincon) Death Row." *Id.*

103. On December 12, 2025, a second formal grievance was opened. Exhibit V at 2-4. Mr. Van Winkle initially filed an informal grievance raising the issue of his points and classification; specifically, he had been assigned 16 points when he was validated as an STG member, but upon successfully debriefing, those points were not removed. *Id.* When the informal grievance was denied, he filed a formal grievance on that same issue, adding that he had been told by COIII Tassone that the 16 STG points for active Membership will not be removed "from my points that are tallied against me." *Id.* He questioned: "How is it that I am being saddled w/ these 16 points when I renounced my membership through the appropriate channels, completely cooperated & ultimately being targeted by a gang that I was formally with. Those 16 points are for people who are active members & choose not to renounce their

membership." *Id.*

105. The response given on January 16, 2026 reported: "[A]s stated in the informal, DO 801 Tech Manual outlines that regardless of Debrief status, all 16 points remain on classification. These points cannot be reduced as outlined in policy. I consider this matter resolved at my level." *Id.* at 4.

106. Next, Mr. Van Winkle filed an informal grievance asserting that he should be moved to lower custody and be allowed art supplies, but the response merely stated that housing was limited for death row inmates. *Id.* On December 13, 2025, Mr. Van Winkle filed a formal grievance, stating:

> While I appreciate your response, while you seem to suggest that I'd be moved based on availability- Tassone told me that I'm going to have to file a lawsuit to move. He said that even though they changed my locator code to A7S it's only for appearance. Art supplies and some commissary. Sorry that doesn't cut it. We will file a suit if DOC refuses to be reasonable. Send to yard, give art supplies until we figure this out.

*Id.* He continued:

> I just had another 30 day case plan where you told me that I've met all my obligations. That there was nothing else I could do, but that short of a lawsuit I couldn't leave. Why don't you include those words in my case plan, if that's just another hoop I have to go through. Once again, I have <u>no</u>

> clear pathway out of there. I met all of my obligations & yet the department insists I remain in lockdown- Not because of behavior, otherwise you wouldn't have written what you did in your response. You keep saying that another inmate won't mediate- this inmate is in Tucson. That is not where you house debriefers anyway. In the meanwhile, my attorney ordered me one set of 150 coloring pencils, one set of 12 drawing pencils, a thing of drawing paper until we can sort all this out.

*Id.* Mr. Van Winkle also wrote up a formal grievance under the same case number on January 5, 2026.

107. The official response to the formal grievance mirrored the earlier response: "Housing is limited for Death row in your situation and we are doing everything possible to give privileges. The art supplies is currently contraband and Browning Unit is attempting to determine the cause so no further issues arise regarding it." *Id.* at 2. The ADCRR continued: "We will continue to monitor the situation and move you based on bed availability for your personal situation." *Id.*

108. Even as Mr. Van Winkle continued to maintain discipline-free conduct while suffering alone in the filthy solitary confinement cell access to education or programming, he continued to seek out opportunities for personal growth. First, Mr.

Van Winkle began to work with his legal team to identify college courses and other educational resources. On December 17, 2025, Mr. Van Winkle's team sent him information packages from Upper Iowa University and Adams State University. The team also began to send worksheets and educational books for Mr. Van Winkle.

109. Mr. Van Winkle also focused on his artwork. *See* Exhibit D. Indeed, his art supplies, which were ordered through the Blick art supplies store – constituted the only privilege that Mr. Van Winkle had throughout the years spent in solitary confinement. Throughout January, February, March, and April, Mr. Van Winkle received additional art supplies, including pastels, colored pencils, graphic pencils, charcoal, and erasers, which were approved by Deputy Warden Rogers. Exhibit U. And Mr. Van Winkle put these art materials to good use, spending most of his 22-hour day in lockdown alternately creating art pieces and studying etymology and history with the books and worksheets sent by counsel.

110. By 2026, Mr. Van Winkle was fighting hopelessness. He had met every ADCRR requirement, maintained clear conduct, completed his programming, and successfully debriefed, and yet he remained in solitary confinement with no

indication that he would ever get out – to the contrary, staff had indicated that he would remain there indefinitely.

111. At this time, undersigned counsel, who represents Mr. Van Winkle in state court proceedings related to his death sentence, Case No. CR2008-128068-001, made multiple attempts to contact counsel for ADCRR to discuss the issue. Exhibit W, Special Action at 4. In February 2026, undersigned counsel left a message for Assistant Attorney General Lucy Rand, who then reached out to Associate General Counsel for ADCRR, Tim Ray. *Id.* at 4-6. Mr. Ray reached out to Ms. Sutton via email on February 24, 2026, and the two met via Zoom on March 4. *Id.* At the meeting, Ms. Sutton raised the issue of Mr. Van Winkle's current classification, the failure of ADCRR to remove his STG points, and the failure of ADCRR to provide a pathway out of solitary confinement following Mr. Van Winkle's renunciation, debriefing, programming, and clear conduct. *Id.* Mr. Ray was not familiar with Mr. Van Winkle's circumstances and agreed to check in with his classification staff.

112. On March 12, 2026, Ms. Sutton followed up by email to request any update. *Id.* Six days later, Mr. Ray emailed Ms. Sutton:

> I spoke with our classification people. They let me know that his family and attorney have contacted them multiple times regarding his classification. Further, they told me that they consistently explained that STG points are not a determining factor in classification or housing decisions. Multiple factors are involved in both classification and housing decisions. Please refer to D.O. 801 - Inmate Classification.

*Id.* at 6. That same day, Ms. Sutton responded:

> Thank you for responding. I do not know what attorneys have contacted the classification people (indeed, I am not sure who the "classification people" are), but I appreciate you having this conversation with me as I have thus far been unable to discuss this issue, particularly as it concerns Mr. Van Winkle's legal and constitutional rights.
>
> While STG points may not be determinative, STG classification is explicitly listed as a criterion in determining initial and reclassification custody, DO 801(3.0) and in determining non-discretionary overrides. DO 801(3.2), DO 812. Thus, if these points are not removed, they remain on his record during the scoring process and housing and classification processes in violation of ADCRR policy concerning individualized classification assessment, DO 801(1.0), and the order in *Jensen v. Thornell*. Additionally, pursuant to the court's directive in *Jensen*, Mr. Van Winkle has requested information on what factors and considerations in addition to his STG points have resulted in his current classification and housing. Although he has pursued his administrative remedies on this point, the ADCRR response has been vague, ambiguous, and insufficient under *Jensen.* Thus, I thank you in advance for following up on this request and providing the requisite information.
>
> Moreover, the ADCRR has not adhered to the order in *Jensen* more

> generally with regards to Mr. Van Winkle's housing and classification, implicating his constitutional rights. In light of this, are you available next week to discuss this issue in more detail, having now familiarized yourself with Mr. Van Winkle's institutional history, current classification status, certified debriefing, and the housing and classification policies generally, particular as they relate to the *Jensen* order?

*Id.* at 6-7, 37-38. Neither Mr. Ray nor anyone from ADCRR responded to Ms. Sutton's email.

113. On April 3, 2026, undersigned counsel again contacted Mr. Ray by email:

> I write with very serious concerns about the treatment of my client, Mr. Pete Van Winkle, and the denial of his constitutional rights as well as the denial of his access to administrative remedies and associated processes. I have raised this in emails to you and in our zoom meeting, but the Department has been non-responsive. Similarly, the Department has been non-responsive with regards to our outstanding public records request for Mr. Van Winkle's ADCRR files.
>
> Yesterday, on April 1, 2026, Mr. Tassone met alone with Mr. Van Winkle and read what was purportedly written on the most recent classification determination. Mr. Tassone reported to Mr. Van Winkle that Mr. Van Winkle had completed all the programming possible and had been respectful and demonstrated good behavior. However, Mr. Tassone then reported that he recommended Mr. Van Winkle be placed in close custody in a maximum custody facility (A75) due to the following reasons:
>
> - Mr. Van Winkle has received three major tickets in last three years.
>     a. Notably, Mr. Van Winkle has received *no* tickets in over a

year. What's more, the facts underlying these disciplinary infractions are not aggravated and he has already completed his disciplinary hold time and all requisite programming.

- Mr. Van Winkle has an institutional homicide.
    a. Numerous other inmates, including Mr. Jasper Rushing and Mr. Leroy Cropper, have an institutional homicides, yet they are housed in Tucson close custody, which is a lower custody classification than Mr. Van Winkle. Significantly, Mr. Cropper has an institutional homicide of a Corrections Officer.

[...]

Following Mr. Tassone's meeting with Mr. Van Winkle yesterday, Mr. Van Winkle requested a copy of the classification documentation so that he may pursue his administrative remedies and appeal. However, Mr. Tassone refused to give Mr. Van Winkle the documentation, even insisting that CO4 Sutton instructed Tassone not to provide it.

Moreover, the ADCRR continues to use the STG points against Mr. Van Winkle in its classification process, despite the fact that he is certified as debriefed and renounced and is no longer classified as STG. I am aware of other inmates who have renounced and who are now housed at Tucson, which again, is a lower custody classification.

Given that the Department (1) has refused to produce documents in response to our public records request, (2) is refusing to provide to our client the necessary paperwork to proceed with his administrative remedies, and (3) is violating the *Jensen* court order by refusing to provide a pathway out, we are prepared to file a special action in Superior Court, and, if necessary, pursue our federal remedies. Of course, we would prefer to not waste the court's critical resources and time and resolve this between us.

> I expect a response and an effort to schedule a meeting. Please let me know your availability next week.

*Id.* Again, Ms. Sutton received no response from either Mr. Ray or any agent of ADCRR.

116. On April 25, 2026, Mr. Van Winkle filed a Complaint for Special Action concerning ADCRR's failure to produce a single page of records in response to undersigned counsel's July 2025 public records request, which encompassed housing and classification records. *Id.* On May 5, 2026, the ADCRR made a partial disclosure of Mr. Van Winkle's records; however, there were significant redactions, particularly concerning Mr. Van Winkle's housing, eligibility for programming, and classification. On May 18, 2026, the ADCRR made its second and final disclosure of records, but again, information concerning housing was redacted on numerous pages. *Id.*

117. In June 2026, Assistant Attorney General Kelly Wagner emailed undersigned counsel concerning the production of records and the issue of redactions, asking for a meeting to see if the special action could be resolved. The next day, undersigned

counsel met with Kelly Gillilan-Gibson, the Unit Chief Counsel of the State Government Division at the Attorney General's office. Ultimately, the ADCRR and undersigned counsel agreed to a protective order allowing undersigned counsel to review that order. This review took place on August 11, 2026.

118. Meanwhile, on August 3, 2026, Mr. Van Winkle received an institutional response to the "grievance you submitted regarding your custody classification." The ADCRR responded:

> In your complaint, you claim that the department is violating existing court orders by failing to provide a clear pathway out of this unit. A comprehensive review of your classification file confirms that you are correctly classified and housed under the agency guidelines: Your current objective classification score mandates a Maximum Custody designation. <u>No administrative override has been recommended by staff or approved by central office at this time.</u> You will remain in Maximum Custody until your points naturally decrease through the standard review periods, or until an override is authorized by Central Office. While you have successfully completed the debriefing process, pursuant to the Department Order (DO) 801 Technical Manual, any inmate who renounces STG membership and satisfactorily debriefs must be classified to Maximum Custody. Per policy, you have been placed in Protective Segregation as strictly outlined in DO 805 and DO 806. Because your classification and housing follow established agency policy and technical manuals, this matter is considered resolved."

Exhibit V at 1.

119. In August 2026, undersigned counsel met in-person with Ms. Gibson to discuss, among other issues, Mr. Van Winkle's classification and continued placement in solitary confinement – particularly given that he had already met all the ADCRR requirements month after month, year after year. Since that meeting, undersigned counsel has had numerous conversations with Ms. Gibson and Mr. Aaron Baumann, General Counsel for ADCRR, but no pathway out has yet been provided, nor has the ADCRR clarified the reason for Mr. Van Winkle's continued placement in light of the differing reasons provided.

***E. Nordstrom v. Ryan Conditions of Confinement Lawsuit***

120. This Court has addressed the conditions of confinement in ADCRR's restrictive housing on several occasions. In October 2015, Plaintiff Nordstrom, a death-sentenced inmate in ADCRR custody, brought an action against the ADCRR for violations of the Eighth and Fourteenth Amendments related to death row conditions. *Nordstrom v. Ryan*, No. 2:15-cv-02176 (D. Ariz.)

121. By the time of the settlement on March 3, 2017, ADCRR had already planned to make death row inmates eligible for reclassification to close-custody housing. *Nordstrom*, Doc. 39. The Settlement included the following three provisions: (1) ADCRR will eliminate the existing permanent classification of inmates with a death sentence to maximum custody units, and permit death row inmates to seek and obtain re-classification to close custody status based on the criteria currently available to non-death sentenced maximum custody inmates; (2) death sentenced inmates who are re-classified to close custody status may be housed as a group, rather than with non-death sentenced inmates, provided, however, that nothing herein shall alter existing protocols and procedures relating to protective custody assignments; and (3) the conditions and restrictions of confinement, and quality of facilities, utilized for close custody housing for death sentenced inmates shall be equivalent to that of existing close custody housing facilities used for non-death sentenced inmates.

122. *Nordstrom* established that death row inmates are entitled to "seek and obtain" reclassification from maximum security to closed custody status. The settlement also

provided that closed custody housing shall be on parity with non-death row inmates. ADCRR must provide a mechanism for death-row inmates to earn a lower classification. While technically there is a policy to obtain this, ADCRR has continuously failed to remedy constitutional violations as it applies to maximum security death row inmates and a path to earn closed custody status, and the privileges included in that security level.

123. Although the *Nordstrom* settlement required ADCRR to create a meaningful opportunity for death‑sentenced prisoners to obtain reclassification and receive conditions equivalent to close‑custody inmates, ADCRR's implementation has been inconsistent and frequently illusory. The department's continued failure to provide a functional pathway out of maximum custody for death‑sentenced prisoners did not occur in isolation; rather, it reflects broader, systemic deficiencies in ADCRR's management of restrictive housing.

124. These same deficiencies were later examined in significantly greater detail in *Jensen v. Thornell*, a class action addressing ADCRR's use of isolation and its chronic pattern of constitutional violations. The *Jensen* litigation thus provides

essential context for understanding ADCRR's ongoing failure to comply with *Nordstrom* and further demonstrates that the barriers Mr. Van Winkle faces are part of statewide practices already found unconstitutional.

***F. Jensen v. Thornell***

125. The Arizona Department of Corrections, Rehabilitation and Reentry ("ADCRR") has a long history of systemic violations in providing minimally humane conditions in its maximum custody units. *Jensen v. Thornell* (No. CV-12-00601-PHX-ROS, D. Ariz.) is a long-running class action originally filed in March 2012 (as *Parsons v. Ryan*, later *Jensen v. Shinn*) challenges both the constitutionality of ADCRR's healthcare system and its use of solitary confinement (called "maximum custody" or "isolation" housing) under the Eighth Amendment.

126. On June 30, 2022, following a 15-day trial, the court issued its Findings of Fact and Conclusions of Law. U.S. District Judge Roslyn Silver found ADCRR violated prisoners' constitutional rights by subjecting them to "near round the clock solitary confinement," holding "hundreds of prisoners in maximum custody housing despite all prison officials admitting there is no penological justification for doing so"

(*Jensen,* Doc. 4335 at 143). In making that finding, the court applied a totality of conditions test- questioning whether the combined isolation conditions ( lack of social interaction, environmental stimulation, nutrition and out-of-cell time) exposed inmates to a substantial risk of serious harm, rather than evaluating each restriction in isolation.

127. In that Order, the court explained that although the case involved an unusually large amount of evidence, it ultimately turned on two basic questions: (1) whether Defendants were violating the constitutional rights of Arizona's prisoners through the existing medical and mental health care system, and (2) whether Defendants were violating the constitutional rights of a subset of Arizona's prisoners through almost round-the-clock confinement in their cells. The Court answered yes to both questions. (*Jensen,* Doc. 4335 at 1.)

128. The court in *Jensen* certified a subclass defined as: "All prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in the following housing units: Eyman–SMU 1; Eyman–Browning Unit; Florence–Central Unit;

Florence–Kasson Unit; or Perryville–Lumley Special Management Area."

129. Mr. Van Winkle qualifies as a member of this subclass; he has been housed at Eyman-Browning since 2021. Although not every person housed at these locations is automatically a subclass member, "the touchstone for inclusion in the subclass is…the amount of isolation experienced by the inmates." (*Jensen*, Doc. 4335, at 124 (citing *Parsons v. Ryan*, 912 F.3d 486, 503 (9th Cir. 2018)).)

130. Prisoners held in government custody have a basic right to health care and humane conditions of confinement protected by the Eighth Amendment's prohibition on cruel and unusual punishment. (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (holding the government has an "obligation to provide medical care for those whom it is punishing by incarceration")). While acknowledging that the Eighth Amendment does not require the highest quality of health care or the "most pleasant accommodations possible," the Court held that health care and conditions of confinement must "reflect basic common decency and a recognition of the dignity the government must accord all human beings." (*Jensen*, Doc. 4335 at 1.)

131. Applying that standard to restrictive housing, the Court found that ADCRR

keeps thousands of prisoners in isolation without providing adequate nutrition or meaningful out-of-cell time for exercise and social interaction. The Court concluded that ADCRR's treatment of the isolation subclass deprives those individuals of basic human needs.

132. On April 7, 2023, the Court issued its Order and Permanent Injunction based on the findings in the June 2022 order. (*Jensen,* Doc. 4410.) The injunction addressed ADCRR's provision of medical care and mental health services and required relief for prisoners held in isolation, and its subclass included prisoners formally classified as "maximum" custody under DO Policy 801. (Doc. 4335 at 136.) The Court attributed ADCRR's constitutional violations largely to inadequate staffing and found that ADCRR's recordkeeping practices were haphazard and often "unreliable." (Injunction at 52.)

133. Critically, the Court found that ADCRR's initial classification decisions were not supported by legitimate penological interests. Although ADCRR maintains a policy allowing prisoners to "earn their way into less-restrictive environments," the Court found that policy is administered "in a random and chaotic way." (Doc. 4335 at

162.) *Jensen* thus made clear that meaningful policy implementation requires a functioning system for returning prisoners — like Mr. Van Winkle — to lower custody levels. Mr. Van Winkle has not been provided with such a mechanism to be reclassified to a different, less restrictive custody level.

134. The Permanent Injunction accordingly requires, at § 29.2: Defendants are required to provide prisoners in maximum custody, detention, or close management a written or electronic copy of their individualized case plan, in a language the prisoner understands, that describes the actions needed, as well as associated timeframes, to progress in their steps in maximum custody and generally to gain more privileges and lower classification levels (less restrictive housing). (emphasis added).

135. The injunction specifies fixed intervals for these classification reviews — 30 days, 60 days, and 180 days. Although ADCRR has technically complied with the scheduled review and classification process, the results have fallen short in substance. The Court Monitor's Second Report found ADCRR compliant with Paragraph 29.2's requirement of individualized case plans, but found ADCRR not in compliance, viewed globally, with Paragraph 29.2.2 (Periodic Classification

Reviews), which requires full classification reviews of subclass members at least every six months, along with additional requirements governing the content of those reviews and the actions that must follow. (Doc. 4755, at 15; see also Attachment C to Monitor Report, at 94.)

136. Most recently, on October 14, 2025, Plaintiffs in *Jensen* moved to enforce §§ 19.3, 29.2, 29.3, and 30 of the injunction, and the Court granted that motion. (Doc. 5032.) The crux of Plaintiffs' claim was that ADCRR lacks an "effective and functioning system to facilitate prisoners' return to lower levels of custody as required by the Permanent Injunction." (Doc. 5032 at 4.) The system ADCRR has in place requires individualized case plans, monthly case plan meetings, 60-day reviews, and 180-day reviews for prisoners held in isolation 180 days or longer — yet Plaintiffs demonstrated that none of these mechanisms adequately facilitates movement to less restrictive housing: case plans fail to describe the actions needed to progress; Defendants do not measure prisoner behavior against those case plans at monthly meetings; and the semiannual classification determinations made by Central Office are frequently untimely and fail to account for progress under the case plans.

Plaintiffs further alleged that some prisoners are held in isolation with no path to lower custody at all.

137. The Court found that although Defendants had made significant progress in many areas of the injunction relevant to this subclass, they had not achieved "substantial compliance" with §§ 19.3, 29.2, 29.3, or 30. (Doc. 5203 at 3.) The Court accordingly ordered ADCRR to develop a remedial plan detailing how it will come into compliance with those provisions. *Jensen v. Thornell*, 2026 WL 2141213 (D. Ariz.).

138. Despite the Permanent Injunction, ADCRR continues to fail to provide a path to lower custody levels for certain maximum custody prisoners, such as Mr. Van Winkle.

139. Mr. Van Winkle is confined in a cell that is roughly 8 feet by 10 feet for 22 hours a day. The cell contains a shower, sink, and toilet. There is a small tray pass in the door through which he receives his meals. Mr. Van Winkle eats all meals alone in his cell.

140. Mr. Van Winkle receives two hours of "recreation" daily. This takes place in a

cage. He is required to be alone at recreation.

141. Mr. Van Winkle cannot have conversations with incarcerated people or interact with anyone other than prison officers. He is completely isolated.

142. Mr. Van Winkle is forbidden by ADCRR to work a job while he is incarcerated in Browning.

143. Mr. Van Winkle is not allowed to participate in any prison programming.

144. In 2025, ADCRR allowed Mr. Van Winkle to have access to colored pencils for his artwork; however, the ADCRR has since withdrawn this permission, leaving him only Number 2 pencils. This rescission was not in response to any misconduct. To the contrary, this happened after Mr. Van Winkle renounced and was certified debriefed.

145. In fact, Mr. Van Winkle has demonstrated repeatedly that he has not abused the privilege of being allowed art supplies and worked respectfully with staff in following directives with respect to quantities allowed in his cell at any given time. He remained violation free during this time period, demonstrating the positive effect that being able to engage in artistic endeavors has had in improving-even to a

minimal degree- his mental health and continued successful efforts to follow disciplinary protocols.

146. Mr. Van Winkle is subjected to repeated and increasing retributive restrictions by Browning administration, despite his renunciation of the Aryan Brotherhood and continued violation free behavior.

147. By way of example, two other Browning prisoners, Tommy Riley (Inmate No. 135692) and Tracy Hampton (Inmate No. 08519) also renounced their affiliation with the Aryan Brotherhood, on or around the same time period as Mr. Van Winkle.

148. Mr. Van Winkle , Mr. Riley, and Mr. Hampton are similarly situated in every relevant respect. Each was formerly affiliated with the same STG, each renounced, each is housed in the same area of Browning, and each is subject to the same visitation rules.

149. Before they renounced, Mr. Van Winkle, Mr. Riley, and Mr. Hampton were routinely allowed contact visits with their family and friends at the same time and in the same contact visitation room.

150. Upon information and belief, during that period no security incident,

disciplinary violation, or other problem resulted from the three men having family visits together-usually it would be two inmates at a time.

151. In fact, during contact visits, each prisoner is chained to the floor at their assigned visiting table. Browning officials could easily accommodate Mr. Van Winkle, Mr. Riley and/or Mr. Hampton by seating them on opposite sides of the contact visitation room, chained to the floor, during the same visitation period.

152. Mr. Van Winkle, Mr. Riley and Mr. Hampton, have sat next or near each other, unshackled, during town hall meetings with administration, with no incident.

153. After Mr. Van Winkle renounced, debriefed and was certified as no longer STG-affiliated, Deputy Warden Hoyt and/or other Browning officials put in place a new practice. Under this new practice, Mr. Van Winkle, Mr. Riley, and Mr. Hampton may not have contact visits at the same time in the contact visitation room.

154. Given that Mr. Van Winkle is allowed one contact visit with family or friends per month, the visitation issue is likely to be an ongoing source of conflict moving forward. Notably, Mr. Van Winkle's contact visits may take place only on the fourth weekend of each month. Should a contact visit not be held on that weekend, it is lost

for the month.

155. In the same area of Browning, prisoners who are currently validated STG members are still allowed contact visits at the same time and in the same contact visitation room.

156. So, under the current visitation process, prisoners who have renounced STG affiliation, such as Mr. Van Winkle, are treated less favorably than prisoners who remain active STG members. For example, Mr. Van Winkle's mother attempted to schedule a normal two hour contact visit on the morning of September 26, 2026, but visitation denied the request because another inmate had a visit scheduled for that morning. Mr. Van Winkle and the other inmate were forced to negotiate the competing visits between themselves, at the risk of losing their one visit per month. They did so successfully, but had to reduce the time of the visit in order to comply with the restrictive rules. Moreover, the ADCRR has stripped Mr. Van Winkle of his one picture a year with his family.

157. Mr. Van Winkle is shackled whenever he leaves his cell.

158. Mr. Van Winkle's prolonged and indefinite detention in solitary confinement

presents an atypical and significant hardship to Mr. Van Winkle in relation to other incarcerated people who are able to spend time outside their cells, participate in activities, work a job, and have human contact – including other incarcerated people on death row and individuals convicted of an institutional homicide. Upon knowledge and belief, multiple individuals incarcerated at the ADCRR have been convicted of institutional homicides, but are held at ASPC-Rincon, where they are out of his cell 10 hours a day and have access to programming, education, and recreation. These individuals include Leroy Cropper, who was convicted of stabbing a corrections officer to death while incarcerated and sentenced to death, *State v. Cropper*, 206 Ariz. 153 (2003), and Thomas Riley, who was sentenced to death for fatally stabbing another inmate over 100 times. *State v. Riley*, 459 P.3d 66 (Ariz. 2020). Additionally, Ricky Wassenaar, who was serving sixteen life sentences for his role in a 2004 standoff at the ASPC-Lewis in which two corrections officers were taken hostage for fifteen days, has now been charged with three institutional homicides and is awaiting trial.

***H. Effects of Solitary Confinement on Mr. Van Winkle***

159. Mr. Van Winkle's mental health has been significantly impacted by his solitary confinement – particularly in light of his renunciation. Mr. Van Winkle sacrificed his safety, his friendships, his privileges, and the only community he has ever known for the sake of institutional security (as the debriefing process requires providing information to the institution about gang activity) and his own personal growth and redemption. For his efforts, the ADCRR has caged Mr. Van Winkle in the most restrictive housing available, stripped him of all privileges, deprived him of sunlight, refused to provide him with educational programming or work opportunities, and profoundly isolated him so that he has almost no contact with other human beings. Mr. Van Winkle repeatedly expressed in writing to the ADCRR that his mental health was suffering under these cruel conditions, even seeking medication, but the ADCRR has refused to make any adjustments.

160. Neuroscience has established that prolonged isolation damages brain function and physically diminishes parts of the brain. That damage includes memory loss, cognitive decline, and depression. Studies indicate that social isolation is a form of stress that is associated with psychiatric and neurological disorders including anxiety,

depression, epilepsy, and memory loss. Social isolation is also associated with a reduction in medial prefrontal cortex volume.

161. A growing body of neuroscience research has consistently found that even short-term solitary confinement (lasting longer than ten days) reliably produces negative psychological effects, including cognitive dysfunction, memory loss, and symptoms akin to post-traumatic stress disorder. These studies have revealed that the neurological effects of solitary confinement are not only severe but may be irreversible and result in permanent and life-threatening impairments.

162. Mr. Van Winkle's mental health issues are well-established adverse reactions to prolonged solitary confinement.

163. Mr. Van Winkle's indefinite solitary confinement and the corresponding deprivations of basic human needs such as social interaction, environmental stimuli, exercise, sleep, and proper psychological and medical care demonstrate that his conditions of confinement are so objectively serious as to constitute a denial of the minimal civilized measure of life's necessities.

164. Despite the obvious and thoroughly documented risks and harms that result

from long-term solitary confinement and Mr. Van Winkle's repeated requests for changes, Defendants have been deliberately indifferent to the psychiatric, emotional and physical harms caused by his solitary confinement. Prison officials have been on notice of the ongoing harm of isolation and have failed to take any reasonable steps to prevent future harm.

## CLAIMS FOR RELIEF

### Count I:
### Cruel and Unusual Punishment in Violation of the Eighth and Fourteenth Amendments to the United States Constitution
### 42 U.S.C. § 1983

89. Mr. Van Winkle incorporates by reference the allegations contained in the preceding paragraphs as if set forth fully herein.

90. The Eighth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishment.

91. A person's conditions of confinement can constitute cruel and unusual punishment under the Eighth Amendment. Specifically, the Amendment "imposes a

duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from serious bodily harm." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008).

92. Mr. Van Winkle's prolonged and indefinite solitary confinement without a pathway out, which has been ordered by this Court in *Jensen*, constitutes cruel and unusual punishment under the Eighth Amendment because he is confined to his cell for 23 hours a day, restricted from having any social contact with individuals other than corrections staff, and unable to access recreation outdoors except alone in a small cage.

93. The cumulative effect of prolonged solitary confinement constitutes a serious deprivation of at least one of his basic human needs, including but not limited to normal human contact, environmental and sensory stimulation, mental and physical health, physical exercise, sleep, nutrition, and meaningful activity.

94. The prolonged period during which Mr. Van Winkle has been deprived of these basic human needs has exacted and is currently exacting severe psychological pain and suffering, as well as permanent psychological injury.

95. Defendants' confinement of Mr. Van Winkle to such conditions fails to honor his basic dignity and humanity in violation of contemporary standards of human decency and constitutes cruel and unusual treatment prohibited by the Eighth and Fourteenth Amendments to the U.S. Constitution. This is particularly true where, as here, Mr. Van Winkle has pursued redemption and rehabilitation by putting himself in peril to renounce the Aryan Brotherhood and completing the debriefing process, which promotes institutional safety.

96. Defendants' actions, individually and collectively, in depriving Mr. Van Winkle of human contact, environmental and sensory stimulation, physical exercise, sleep, nutrition, and meaningful activity are not legitimately related to security or other penological needs of isolating an incarcerated person from others but rather are an arbitrary and overly punitive exercise of power.

97. The policies and practices complained of in this Complaint have been and continue to be implemented by Defendants Thornell and Winfrey and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities.

98. Defendants have been and are aware of all deprivations complained of herein, and have ordered, condoned, or been deliberately indifferent to such conduct.

99. It should be obvious to Defendants and to any reasonable person that Mr. Van Winkle's indefinite conditions of confinement cause extreme psychological pain and suffering. Furthermore, Defendants have been made aware of Mr. Van Winkle's suffering through administrative grievances and communication with undersigned counsel. Since being placed in solitary confinement, Mr. Van Winkle has repeatedly requested relief from these debilitating conditions of confinement. Defendants have been deliberately indifferent to the serious physical and psychological harm being inflicted on Mr. Van Winkle and have therefore violated the Eighth Amendment.

## **REQUESTS FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court grant him the following relief:

I. A declaration that Defendants' policies and practices of committing Plaintiff to prolonged and indefinite solitary confinement under the conditions set forth

in this Complaint violate the Eighth Amendment prohibition on cruel and unusual punishment;

II. A declaration that Defendants' policy of indefinitely using Plaintiff's STG points after successful renunciation and debrief results in indefinite prolonged solitary confinement in violation of the Eighth Amendment;

III. A declaration that Do Not House complaints cannot be used to indefinitely incarcerate Plaintiff in solitary confinement when Plaintiff is willing to mediate;

IV. Injunctive relief ordering Defendants to accomplish the following:

A. Alleviate the conditions of Plaintiff's confinement so that Plaintiff is no longer incarcerated under conditions of isolation, sensory deprivation, environmental deprivation, and lack of social and physical human contact, in a way that is designed to successfully reintegrate Mr. Van Winkle into living and social conditions in which he is among other incarcerated individuals;

B. Allow Mr. Van Winkle access to art supplies;

C. Allow Mr. Van Winkle access to education and programming;

D. Allow Mr. Van Winkle work/employment opportunities at the prison;

E. The costs of this suit and reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988, and other applicable law;

III. Retention of jurisdiction of this case for the remainder of Mr. Van Winkle's life in the custody of ADCRR;

IV. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Date: 10/6/2026

By: Jessica E. Sutton
Attorney for Plaintiff
Bar Number: 038994

**CERTIFICATE OF SERVICE**

I hereby certify that on October 6, 2026, I electronically filed the foregoing with the Clerk of the Federal District Court for the District of Arizona.

________________________________

Jessica E. Sutton
Attorney for Plaintiff,
Pete Van Winkle